361 So.2d 1292 (1978)
Charles WHITE, Jr., et al.
v.
Dr. W. R. EDISON.
No. 12060.
Court of Appeal of Louisiana, First Circuit.
July 10, 1978.
Rehearing Denied August 31, 1978.
Writ Refused October 20, 1978.
*1293 Roy Maughan, Baton Rouge, of counsel for plaintiffs-appellees Charles White, Jr. & Gertrude Gayden White.
Frank W. Middleton, Jr., Baton Rouge, of counsel for defendant-appellant Dr. W. R. Edison.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
Defendant (Appellant), an obstetrician, appeals from judgment in favor of plaintiffs Charles, Jr., and Gertrude Gayden White, for medical malpractice in failing to provide post-delivery treatment of sixteen year old Mrs. White during the interval following her discharge from the hospital after the normal birth of her child, and her voluntary re-hospitalization a few days later for a condition which proved to be a ruptured tubo-ovarian abscess necessitating removal of the patient's fallopian tubes and ovaries. The trial judge held that Appellant, though not responsible for the loss of the patient's bodily organs, was remiss in failing to see or examine the patient subsequent to her hospital discharge, despite telephoned complaints of pain and other symptoms of illness. So finding, the trial judge held that Appellant's negligence in failing to heed the patient's complaints and either see or examine the patient contributed to the patient's pain and discomfort. The trial court also found that had Appellant seen the patient, the rupture of the abscess might have been prevented, thus sparing the patient the inconvenience, suffering and expense attendant upon a more complicated surgical process and a more prolonged recuperative period. We affirm.
Except as otherwise noted, there is little dispute as to the operative facts. On January 11, 1973, Appellant delivered Mrs. White of an 8 pound 11 ounce child. Because of the mother's youth and the size of the child, delivery required a somewhat larger than normal incision to aid delivery. Recovery was uneventful except for complaints of abdominal pain which Appellant attributed to the incision and normal after birth discomfort. At approximately noon, *1294 January 14, 1973, the patient was discharged from the hospital pursuant to orders of Appellant, who had seen her earlier that morning and ordered discharge despite her complaints of pain, which were deemed by Appellant to be normal.
In the evening of the day of discharge, Appellant was contacted by the patient's mother, who reported via telephone that the patient was experiencing intense pain and that the patient's stomach was black and hard. Appellant attributed the symptoms to normal after birth complaints of an exceptionally young mother having borne a very large child. Appellant directed that the patient be continued on previously prescribed medication, begin taking sitz baths (sitting in hot water), and prescribed additional medication. On January 15, the mother again called Appellant, stating that the patient was worse and was having difficulty getting out of bed. Appellant acknowledges the call, but contends it was merely reported that the patient was still having pain and did not want to get up. Appellant concedes that he again prescribed continuation of medication and sitz baths. On January 16, the mother called Appellant again and reported a worsening of the condition. Appellant again advised continuation of prescribed medication and baths. On January 17, patient's mother called Appellant and advised that the patient was worse and was having chills and fever. Appellant concedes that fever was mentioned on this occasion, but he was not told the patient was having chills and fever. Appellant admits he instructed that the patient's temperature be taken with a thermometer, and that he be advised of the result. The mother responded that she did not have a thermometer and could not read one. Appellant suggested that she obtain a thermometer, have a friend or neighbor take a reading, and that Appellant be advised as to the result. It is conceded that the mother did not take a temperature reading. The mother attested to further calls on January 18 and 19, advising that the patient was worse and was still having chills and fever. Appellant disputes these alleged calls and maintains that he heard nothing further after the call on January 17. He also maintains that he was never advised that the patient was having chills and fever.
At approximately 5:00 A.M. January 20, 1973, the patient was voluntarily re-admitted to the hospital emergency room. Appellant was summoned and saw her at approximately 6:00 A.M. At this time, the patient was found to have a low grade fever of 994/5 degrees, a distended abdomen, and to be in considerable pain and distress. Appellant ordered immediate large doses of antibiotics for what he believed to be an inflammatory infection of the pelvic area. A blood count and urinalysis proved essentially negative. By noon, the patient's temperature had risen to 100 degrees, and at midnight it reached almost 104 degrees. On the afternoon of Sunday, January 21, 1973, the patient was seen by Dr. Anthony Leggio, Chief of the hospital's obstetrical and gynecological staff. Dr. Leggio considered the patient very ill, and concluded that she had a "surgical abdomen" which needed exploration. Dr. Leggio concluded that the problem could be due to appendicitis, a gall bladder condition, an ulcer, or tubo-ovarian abscess. Dr. Leggio ordered greatly increased dosages of antibiotics administered intraveneously to expedite hoped for beneficial results. Despite increased medication, the condition of the patient worsened so that on Monday, January 22, 1973, Dr. Leo Farmer, General Surgeon, was called in consultation. Dr. Farmer diagnosed the condition as a generalized abdominal inflammation or infection. He was of the view that a ruptured appendix was the most likely cause of the problem. Dr. Farmer approved the dosage and medication then being administered and recommended its continuation. The patient's condition continued to worsen and on January 23, 1973, Dr. Farmer performed surgery which revealed abscesses of the patient's fallopian tubes and ovaries (on both sides), the right side having ruptured and spread purulent material throughout the abdominal cavity. Additionally, two secondary abscesses of the lower diaphragm were also noted. Both tubes and ovaries were removed, *1295 the secondary abscesses were drained, the abdominal cavity was cleared of purulent material. The patient was placed in intensive care for approximately two weeks. In early February, Dr. Farmer performed additional surgery to redrain the secondary abscesses. The patient remained hospitalized until February 18, 1973. By March 16, 1973, the patient had recovered to the extent that she could commence a recommended mild exercise program.
The expert testimony is clearly to the effect that the abscesses were present prior to the patient's readmission to the hospital, although none of the experts could say when the abscesses started to form. The experts are also in agreement that upon readmission to the hospital, Mrs. White was a very sick person. It is also agreed by the experts that tubo-ovarian abscesses require surgical removal because antibiotics cannot cure an abscess once it forms. There is also expert unanimity to the effect that delay in treatment in this instance would not have averted removal of the patient's tubes and ovaries; that the rupture of the tube enhanced the danger to the patient; and that post-operative recovery for a ruptured tubo-ovarian abscess is considerably longer and more expensive than for removal of such abscesses which have not ruptured.
The trial judge concluded that Appellant was negligent in not heeding the complaints of pain, abdominal distention and chills and fever, and that the patient's distress would have been less had earlier treatment been afforded. The trial judge also found that the deferred treatment might have made a difference only in the patient's discomfort or chance of dying and concluded that, although the medical evidence does not show exactly when the rupture occurred, earlier treatment could have well prevented the rupture of the abscess.
A physician must exercise the degree of skill ordinarily employed under similar circumstances by members of his profession in good standing in the same community or locality, and must also use reasonable care and diligence along with his best judgment in the application of his skill in each instance. Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1953).
A physician holding himself out as a specialist in the treatment of a particular disease, organ, or type of injury, is bound to exercise not only the degree of skill exercised by the average general practitioner, but also that special degree of skill and knowledge possessed by specialists in the same field, regard being made to the state of scientific knowledge at the time. Percle v. St. Paul Fire & Marine Insurance Co., 349 So.2d 1289 (La.App. 1st Cir. 1977). See also Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La.1978).
Although our own jurisprudence is silent on the question, it appears well established that a physician is not negligent in allowing intervals to lapse between his visits to a patient when the patient needs no attention, but that he is negligent if he fails to see or attend to a patient in need of his care or services. Mehigan v. Sheeham, 94 N.H. 274, 51 A.2d 632 (1947); Thaggard v. Vafes, 218 Ala. 609, 119 So. 647 (1928); Crooks v. Jonas, 204 N.C. 797, 169 S.E. 218 (1933); Reed v. Laughlin, 332 Mo. 424, 58 S.W.2d 440 (1933). We find the rule imposes a reasonable duty of care and adopt it as our own.
In a medical malpractice suit, plaintiff bears the burden of establishing the physician's deviation from the standard of care required by others in the same field or specialty. Ardoin, supra.
In a medical malpractice suit, plaintiff also bears the burden of establishing causal relationship between the physician's alleged negligence and the injury allegedly resulting therefrom. Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir. 1975).
Appellant, a practicing physician since 1920, has limited his practice mainly to obstetrics and gynecology since 1940, although he has had no specialized training, residency or internship in these particular fields. His specialized knowledge in these areas has been gained from experience and in keeping *1296 up with medical journals. In addition to Appellant, expert testimony was offered by Drs. Leggio and Farmer, and Drs. Jack Jones and Julius Mullins, Obstetrician-Gynecologists. The overwhelming preponderance of their testimony is that post-delivery symptoms of abdominal pain and distention and slight temperature are normal and to be expected following birth of a large child by a young mother.
Appellant disputed the mother's claim to have reported the patient having chills and fever. He explained that slightly elevated temperature alone would be no cause for alarm or further treatment subsequent to the patient's discharge from the hospital, but that a patient having chills and fever would require further attention because such symptoms usually indicate infection. Appellant made it clear that he would not make a diagnosis of fever without a thermometer reading and did not accept the mother's diagnosis of fever based simply on touch and feeling. He added that he assumed the patient was doing all right because he heard nothing further after requesting a thermometer reading of temperature and was most surprised when he received the telephone call advising that the patient had been re-admitted to the hospital.
Dr. Jones testified that it was to be expected that the patient would experience pain and slight temperature following delivery. He stated that if the patient were having true chills and fever, attention of the physician was in order. He also stated that slight fever, as much as 100 degrees, would not require attention in the absence of accompanying chills. Dr. Jones was of the view that had the patient been rehospitalized on the 17th or 18th, treatment would have been the same, namely, conservative by way of antibiotics and that the course of the infection and/or abscesses would not have been altered.
Dr. Mullins' testimony was virtually the same as that of Dr. Jones. He felt that hospitalization two or three days earlier would have changed nothing. He, too, would not have re-hospitalized the patient for abdominal pain and mild fever. He stated, however, that had he received two or three calls stating that the patient had fever, he would have brought the patient back to the hospital.
Dr. Leggio testified that a patient rarely develops abscesses during pregnancy. If such potential is present (as in this case it was due probably to prior venereal disease), the condition remains quiescent until delivery and then "pops up" and the patient becomes very ill. He has seen an average of about 2 such cases per month, a total of about 150, of which only 5 occurred during pregnancy. He stated that if he were advised a patient was having chills and fever, he would see the patient in his office or at the hospital and if he received such information on successive days, he would examine the patient. He believed the rupture could have occurred at any time within 24 hours before he saw the patient or between the time of his examination and first surgery.
Dr. Farmer considered the patient quite ill on first examination, but felt that antibiotics should be given a chance to work before resorting to surgery. He agreed with the other experts that once the abscesses developed, antibiotics could not cure them, but were nevertheless administered in the hope that the patient would improve. He also agreed that once abscesses formed, the loss of the patient's tubes and ovaries was inevitable, because their function and use had been destroyed.
Thus, the crucial question is whether Appellant should have heeded the complaints of continued pain, distention of the abdomen and chills and fever. Appellant admitted he chose not to heed the mother's report of temperature without thermometric confirmation. He denied receiving reports of the patient having chills and fever. The trial judge believed the mother's testimony that she reported on successive days that the patient was having chills and fever. Considering the testimony of the mother (believed by the trial court), and also that of Drs. Leggio and Mullins, we find that there is ample evidence to support *1297 the finding that a duty was owed by Appellant to see his patient in this instance. Finding no manifest error in this conclusion of the trial judge, we affirm. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
That Mrs. White was gravely ill upon re-admission to the hospital is evidenced by the rapid rise in her temperature on that day. Dr. Leggio's initial examination showed that an exploratory operation was absolutely necessary. The significant increase in the dosage of antibiotics ordered also affirms the severity of the patient's condition. In this connection, Dr. Leggio testified that if abscesses are the cause of a patient's problem, the sooner they are treated with antibiotics, the greater possibility exists for prevention of rupture prior to surgery. We agree with the trial judge's conclusion that the delay in treatment exposed the patient to greater morbidity as well as complications attending surgery for a ruptured abscess as compared to an abscess which has not ruptured. As did the trial judge, we find causal relationship between Appellant's remission and the added discomfort and exposure to the patient.
The medical evidence establishes that in the removal of unruptured abscesses, a second operation is rarely, if ever, required to provide additional drainage. In this instance, the patient was subjected to a second surgical procedure because the secondary abscesses of the diaphragm had to be redrained. In allowing recovery, the trial judge awarded $12,500.00 for pain and suffering. Considering that the patient's tubes and ovaries would have had to be removed regardless of her post delivery treatment by Appellant, and also considering that the rupture of the abscess required longer than normal hospitalization, the trial judge awarded medical expense in the sum of $5,790.78, or two thirds of total hospital costs. We find this solution equitable.
The judgment of the trial court is affirmed at Appellant's cost.
Affirmed.