428 So.2d 1000 (1983)
Gloria WILLIAMS, Individually and as Natural Tutrix of the Estate of her Minor Child, Roderick Williams
v.
LALLIE KEMP CHARITY HOSPITAL.
No. 82 CA 0227.
Court of Appeal of Louisiana, First Circuit.
February 22, 1983.
Rehearing Denied April 6, 1983.
*1002 John W. DeGravelles and John Caskey, Baton Rouge, W. Hugh Sibley, Greensburg, for plaintiff-appellee.
Arthur W. Macy and Duncan S. Kemp, III, Hammond, William R. Carruth, Jr., Baton Rouge, for defendant-appellant.
Before LOTTINGER, EDWARDS and LANIER, JJ.
LOTTINGER, Judge.
This is a medical malpractice case in which the mother of Roderick Williams, Gloria Williams, brought suit individually and as tutrix of her child against Lallie Kemp Charity Hospital (LKCH), a state institution. She seeks damages for her son's injuries, claiming they were sustained during his delivery at LKCH; and she also asks for an award for the failure of the defendant to obtain her informed consent before delivering Roderick. LKCH was sued because of its employees' acts and omissions.
From the trial court's judgment awarding the plaintiff $500,000 for her son's injuries and $25,000 in her own right, the defendant appeals. The plaintiff has answered the appeal.

SPECIFICATIONS OF ERROR
The defendant LKCH assigned thirteen specifications of error, the majority of which question the trial court's findings of fact and the questions of liability and quantum, and in addition alleged the trial court erred in finding that the doctors were "specialists" within the meaning of La.R.S. 40:1299.39 A(4).[1]
In answering the appeal plaintiff alleges the trial court erred in finding La.R.S. 40:1299.39 applicable and constitutional and in limiting damage awards.

*1003 FACTS
Roderick Williams was born on March 9, 1979. Today he is a profoundly retarded, brain damaged spastic quadraplegic, deaf and almost totally blind. We adopt the trial court's factual findings and observations as our own:
"After Roderick was conceived, plaintiff sought and received prenatal care from Lallie Kemp Charity Hospital. Her prenatal course was uncomplicated. It was discovered early during her prenatal care that the fetus was in a breech position, a significant factor in the events which followed. Both an ultra-sound test and clinical measurements made during her regular visits were performed on Ms. Williams and established the date for expected delivery to be February 20, 1979.
"She did not, however, begin labor until 6:30 p.m. on March 8, 1979, and arrived at Lallie Kemp Charity Hospital at around 4 a.m. on the following day. After admission she was examined by a medical student, Mary Bajo, but thereafter came under the primary care of Dr. Dean Takao Yamaguchi, then a first year resident (or intern) in obstetrics. Dr. Yamaguchi apparently examined Ms. Williams at some point prior to the time she was moved to the delivery room, but the exact time is not reflected in the record, and Dr. Yamaguchi recalled little about the events prior to the time of delivery. She was also examined at some point prior to delivery by Dr. C.C. Sherrod, the senior resident in obstetrics, and several times by the medical student, Bajo.
"The record indicates that fetal heart tones (an important test to monitor the condition of the fetus during labor) were taken only twice: at 4:30 a.m. and 7 a.m., both times by the medical student, Bajo. Although Lallie Kemp owned an electronic fetal heart monitor machine which would have provided for continuous monitoring of the fetal heart and which was available for use on Ms. Williams for at least some period of time prior to the time she was taken to the delivery room, the evidence is clear that the electronic fetal heart monitor machine was never used on her.
"At 5:50 a.m. Drs. Sherrod and Yamaguchi began a Cesarean section on another mother. This procedure ended at 7:13 a.m. Ms. Williams, in the meantime, was x-rayed at about 6 a.m. and was taken from the labor room to the delivery room at around 7:30 a.m. The decision was made to deliver the baby vaginally rather than by Cesarean section. Although this is a decision which, according to the testimony, was supposed to be made by staff at Tulane and such clearance noted in the record, no reference to such clearance is found in the record introduced at trial.
"Dr. Yamaguchi started the delivery and at some point thereafter experienced difficulty, the exact nature of which is in dispute. Dr. Sherrod was called to give assistance. The child, when finally delivered, was very depressed and asphyxiated and required emergency procedures to revive it.
"The child was, in fact, saved and for several days thereafter seemed to recover and be responding normally. However, on March 15, 1979, Roderick suffered his first `apneic episode' in which he quit breathing, and once again had to be given emergency resuscitation. A second such episode occurred two days later after which the child was finally transferred to Charity Hospital in New Orleans for more sophisticated testing and treatment.
"The condition of the child is not in dispute and was described by the physicians as profoundly retarded, both physically and mentally; almost totally blind and also deaf. The condition was described as being permanent.
"Plaintiff claims that these terrible injuries suffered by Roderick Williams were caused by negligent predelivery care, during which, plaintiff alleges, the defendant failed to monitor the child or otherwise recognize and/or prepare for the high risk status of the pregnancy, and secondly, was caused by the negligent delivery of the child. With regard to the latter allegation, plaintiff charges that, among other things, defendant negligently decided to perform a vaginal delivery rather than a Cesarean section; *1004 defendant failed to use Piper forceps during the vaginal delivery; defendant took five minutes to deliver the head of the child; and defendant failed to have and/or utilize the services of a nurse-anesthetist during delivery. Plaintiff finally claims damages arising from the failure of the doctors at Lallie Kemp to obtain her informed consent prior to the institution of the vaginal delivery technique.
"The State has filed a post-trial memorandum, and it is apparent from the arguments contained therein and the evidence presented by the State at trial that it denies any negligence on the part of its employees and further claims that the child's condition is genetic in origin and completely unrelated to the care received by the mother and child prior to, at the time of, or after the delivery.
"Because of the extensive and complex nature of the testimony, the Court requested a transcription of the trial proceeding. The Court has carefully reviewed this transcript, the depositions and other exhibits introduced at trial, and concludes that plaintiff has proved that the hospital, through its employees, was negligent and that this negligence was a proximate cause of the severe injuries sustained by this young child.
"A threshold issue in this case is the question of the cause of the child's present condition. Obviously, if this condition is genetic as argued by the State, any negligence of the State in the medical care rendered to Ms. Williams and Roderick would be of no legal moment. The weight of the evidence, however, shows that this child's condition resulted from brain injury caused by a deprivation of oxygen to the brain which occurred during the unmonitored labor of the mother, during the prolonged delivery of the baby's head, during the post-partum apneic episodes, or from a combination of these episodes.
"Both parents of this child were, according to the undisputed testimony, normal and without mental health or retardation problems. Ms. Williams was a high school graduate with average to above average grades and class standing. The Court observed Ms. Williams and found her to be of average intelligence.
"Much more persuasive than the condition of the mother and father, however, was the expert testimony on this point. Of the doctors giving expert opinion on this point (both for defendant and plaintiff), only one believed the origin of the child's condition to be genetic. Dr. Luis Boothby who was present at the time of the delivery diagnosed the condition and cause of Roderick's problem as `neo-natal asphyxia, probably secondary to prolonged delivery of the head; seizures disorder, probably secondary to hypoxic brain damage; spasticity, probably secondary to hypoxic brain damage.' Furthermore, Dr. Boothby felt that the prolonged delivery of the head was probably related to the child's later `apneic episodes' described elsewhere as a `seizure disorder.'
"Another pediatrician who treated the child while at Lallie Kemp Charity Hospital and a witness presented on behalf of the State, Dr. Arthur C. Watts, likewise testified that he believed that the child's condition was caused by brain injury in turn caused by oxygen deprivation which occurred either during the prolonged delivery of the head of the child or in one or both of the apneic episodes which occurred several days after the child's birth.
"Finally, the testimony of Dr. Harlan Giles, obstetrician-gynecologist, perinatologist, and geneticist, confirmed that the oxygen deprivation which occurred in the labor-delivery process and in the newborn period, rather than the genetic makeup of the parents, accounted for the child's severe problems.
"In opposition to these doctors, the State offered the testimony of Dr. Theodore F. Thurmon (pediatrician and geneticist) who opined that the child's difficulties were genetic and had nothing whatever to do with the events preceding or following the child's birth.
"The next issue is whether or not the medical care rendered by the State was substandard, and if so, what role if any this *1005 substandard care played in the child's eventual outcome. LKCH argues that the `locality rule' applies and hence plaintiff must prove that the employees of LKCH breached the standard of care and skill ordinarily employed, under similar circumstances, by the members of that profession licensed to practice in the State of Louisiana who are in good standing in a similar community or locale, and further that Dr. Giles, being an out-of-state physician is not competent to testify under this `locality rule.'

* * * * * *
"[The] Court finds that Drs. Yamaguchi and Sherrod, being licensed physicians and having limited their practice to obstetrics and gynecology, and further having held themselves out as so limiting their practice, are `specialists' within the meaning of LSA-R.S. 40:1299.39(A)(4), and are therefore not entitled to the benefits of the `locality rule.' White v. Edison, 361 So.2d 1292 (La.App. 1st Cir.1978), writ den. 363 So.2d 915 (La.1978).
"More importantly, perhaps, is the testimony of several of the doctors who testified at trial, including Drs. Yamaguchi and Sherrod, who stated that the standard of obstetrical care at LKCH was no different and certainly no less than the standard of obstetrical care given at other hospitals across the state and country. Since the standard of LKCH is comparable to and in no way different from the standard of care elsewhere, even if the `locality rule' were to apply, Dr. Giles, who testified as to his knowledge of the standard of care in rural teaching hospitals as well as to a general knowledge of the program at Tulane, is, in the Court's opinion, well qualified to give expert testimony. The Court must also note that there was no effort made by LKCH at the trial to preclude Dr. Giles' testimony based on the applicability of the `locality standard.'
"After hearing the testimony and reviewing the record, the Court finds that the State, through its employees, breached the applicable standard of care in several respects. First, the efforts to monitor the child were woefully inadequate. All the doctors who testified admitted the importance of fetal heart monitoring since this is the test which monitors `fetal distress' which is an indication that the fetus is being deprived of oxygen and may become asphyxiated. The evidence showed that such monitoring could be done manually or with an electronic monitoring device.
"Dr. Charles D. Alford, Jr., a Hammond physician specializing in OB-GYN and called as an expert witness on behalf of the State, agreed that the fetal heart rate should be taken and recorded at least every thirty minutes in the first stage of labor and every five minutes in the second stage, citing the `Standard for Obstetric-Gynecologic Services' published by the American College of Obstetricians and Gynecologists. The record shows that this simply was not done, but rather, that the fetal heart tones were taken only twice during the three and one-half hours between the time she was admitted to the hospital and the time she was taken to the delivery room. Furthermore, while it appears that the electronic fetal heart monitoring device was available for use on Ms. Williams after 5:30 a.m., this was likewise not utilized. It is likely that this child suffered at least some degree of oxygen deprivation during labor which went unrecognized because of the failure of the staff at Lallie Kemp to adequately monitor this child, either manually or mechanically, in accordance with the clearly recognized standard of care.
"The Court also finds that the attending physicians were negligent in failing to use Piper forceps during a difficult vaginal delivery of the child's head. The child was in a breech position which, according to all of the medical testimony, significantly increases the chances of complications and serious injury during delivery. One of those complications is `head dystocia' or a situation which arises when the head is caught in the birth canal after the rest of the body was already been delivered and is free of the body. During such head dystocia, the child may be deprived of oxygen and, accordingly, it is most important that corrective action be taken as quickly as possible to free the head.
*1006 "The Court is convinced that Roderick suffered head dystocia during the delivery for a period of approximately five minutes. The attending pediatrician present during the delivery unequivocally states this in the hospital record. This was corroborated by the testimony of Gloria Williams herself, who testified that the head was `hung up' for five to ten minutes. Dr. Dean T. Yamaguchi, the obstetrician making the delivery, admitted in his deposition that the head did, in fact, become `hung up' but was not sure as to the amount of time in which it became hung up. He states that he called for the assistance of the senior resident, Dr. Sherrod, to apply `fundal pressure' to help relieve the situation, a technique used to attempt to correct head dystocia. However, all who were present testified that `Piper forceps,' a basic and well-recognized tool for use in just such an emergency situation, were not used.
"In her deposition which was introduced in lieu of her live testimony, Dr. C.C. Sherrod testified that she did not recall any difficulty with the baby's head during delivery. Dr. Yamaguchi, when he testified at trial, attempted to change his prior testimony with regard to recalling the head dystocia. The Court finds the testimony of Dr. Yamaguchi to be unworthy of belief, particularly on this point, and especially in view of his prior testimony and his failure to give any adequate explanation on the change therein. Furthermore, neither Dr. Yamaguchi nor Dr. Sherrod gave a satisfactory explanation as to why an apparently impartial observer (Dr. Boothby) would conjure up the account given in the hospital record, which account the Court finds to be consistent with the credible evidence presented in the case and the eventual outcome in the child's condition.
"The expert opinion of the State's own expert witness, Dr. Alford, was that the failure to use Piper forceps to attempt to dislodge the child's head if the child's head was hung up for a period of five minutes would be substandard or negligent care. The Court is also of the opinion that the oxygen deprivation suffered by the child during this period of dystocia either alone or in combination with oxygen deprivation suffered during the unmonitored labor, accounts for the brain damage suffered by the child or at least accounts for the later apneic episodes in which the child quit breathing and suffered further periods without oxygen.
"The question of whether or not the failure to perform a Cesarean section under the circumstances existing at the time is a closer question. On balance, however, the Court believes that when the circumstances are considered, namely the overdue condition of the mother, the erroneous impression Dr. Yamaguchi had of the age of the fetus, the failure to have adequate monitoring (for whatever reason), the misreading of the x-ray by Dr. Sherrod, and the failure to have x-ray pelvimetry films available, the decision to perform delivery vaginally as opposed to by Cesarean section was a negligent one. While Dr. Sherrod claims to have cleared the decision to perform the delivery vaginally with the medical staff at Tulane by telephone, this is not reflected in the record, although she testified it normally would be. Even if this were done, however, such clearance would have little effect, since it would presumably have been based on Dr. Yamaguchi's erroneous belief that the fetus was forty weeks old and Dr. Sherrod's erroneous reading of the x-ray film. In any event, the Court finds that the failure to perform a Cesarean section timely was negligent, and this negligence was a contributing proximate cause of the child's outcome.
"Gloria Williams claims damages suffered by her individually as a result of the failure of these physicians to obtain her informed consent prior to instituting the vaginal delivery as opposed to utilizing the alternative method available, the Cesarean section. The unchallenged testimony of Ms. Williams was that she was never told of the alternative methods available, nor was she given any explanation of the risks and advantages of each such alternative methods. Furthermore, she was never asked to give her consent to the procedure that was dictated to her by the physicians. Her testimony *1007 on this point is corroborated by the absence of a written consent although such written consent is required. LSA-R.S. 40:1299.40.
"The failure to obtain such informed consent gives rise to liability even in the absence of negligence. Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.1978). In the present case, Ms. Williams testified that had she been aware of the significance of the breech position of the fetus, and the possible complications to the child given the breech position of the child, she would have chosen to have the baby delivered by Cesarean section. Having been deprived of this opportunity to exercise informed consent, the Court finds that Ms. Williams has suffered damages in her own right." (footnote omitted)

LIABILITY
We agree with the facts found and the conclusion reached by the trial judge that the defendant through its employees breached the duty owed plaintiff in failing to perform a Cesarean section timely.

APPLICABILITY OF LA.R.S. 40:1299.39
Plaintiff-appellee argues that La. R.S. 40:1299.39[2] is not applicable to the *1008 instant case in that the statute's singular purpose is to provide advantages for certain persons, as defined in La.R.S. 40:1299.39 A(1), while acting within the course and scope of their employment with the state in providing health care services vis-a-vis the state or state owned facilities. Thus, since plaintiff-appellee has sued LKCH, a state-owned hospital, alone, the statute does not apply. Plaintiff-appellee further argues that since the definition of the word "person" in La.R.S. 40:1299.39 A(1) does not include the term "hospital" as compared to the definition of "health care provider" in La.R.S. 40:1299.41 A which does include and cover the term "hospital," then the legislature intended to include a "hospital" within the ambit of La.R.S. 40:1299.41 et seq, "Medical Malpractice" and did not intend to include a hospital within the ambit of La. R.S. 40:1299.39, "Malpractice Liability for State Services."
We are convinced after a complete review and study of the legislative history of La. R.S. 40:1299.39[3] that the legislature intended to cover not only employees of the state providing health care services, but also the state itself. It seems clear to this court that the intention of the legislature is adequately expressed in La.R.S. 40:1299.39 B which provides:
"Limitation of Liability. Not withstanding any other provisions of the law to the contrary, no judgment shall be rendered, and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of $500,000 plus interests and costs." (Emphasis added) *1009 The significant language is that providing that "in any action or claim for an alleged act of malpractice." The instant suit, though it is against the state, is based on an alleged act of malpractice.
Plaintiff-appellee maintains that her suit is not one for malpractice, since that term is defined in La.R.S. 40:1299.39(A)(5) as "... any unintentional tort or any breach of contract based on health care of professional services rendered, or which should have been rendered, by a health care provider to a patient." (Emphasis added) The term "health care provider" is equated to "person" in subsection C, so a suit based on "malpractice" can only be one against the named persons in subsection A(1), says plaintiff-appellee. We designate the present suit a claim for "malpractice" because it is founded on the acts and omissions of LKCH's employees who are "health care providers." LKCH was not alleged nor found to be independently negligent, but was held liable for the unintentional torts of Drs. Sherrod and Yamaguchi and several nurses committed before and during the baby's delivery.
Additionally, La.R.S. 40:1299.39 D provides that "all malpractice claims against the state shall be submitted to and administered by the Division of Administration." Here again it is evident that the legislature obviously contemplated suits and/or claims against the state.
Thus we hold that La.R.S. 40:1299.39 is applicable to suits against the state for alleged acts of malpractice committed by its health care provider employees.

CONSTITUTIONALITY OF LA.R.S. 40:1299.39 B
Plaintiff-appellee challenges the limitation of liability provision of the Malpractice Liability for State Services Act on several constitutional grounds. She maintains that the statute violates the equal protection and due process clauses of the federal and state constitutions,[4] the state constitutional right to open access to the courts,[5] and the state constitutional prohibition against special or local laws.[6] We will consider each challenge separately.
Initially we note that appellee has standing to challenge the constitutionality of La. R.S. 40:1299.39 B because proven damages do exceed the $500,000 ceiling set forth therein. The constitutional issues raised by the appellee thus need be addressed by us so that a full resolution of her rights may be given. Everett v. Goldman, 359 So.2d 1256 (La.1978); Aucoin v. Dunn, 255 La. 823, 233 So.2d 530 (1970).

EQUAL PROTECTION
The Louisiana and federal constitutions both require equal protection of the laws. U.S. Const.Amend. XIV; La. Const. art. I, § 3. When a claim is made that a law violates these provisions, and the claimant belongs to a class receiving disparate treatment, a determination must be made as to whether the law impinges on a "fundamental right" or operates to the disadvantage of some "suspect class." If the law does either of the above, it will be subject to strict scrutiny and be declared invalid unless it is shown that a "compelling governmental interest" exists; if neither a suspect class nor a fundamental right is involved, the test is whether the discriminatory treatment is supported by any rational basis reasonably related to the governmental interest sought to be advanced by it. Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); San Antonio. Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Bazley v. Tortorich, 397 So.2d 475 (La.1981); Everette v. Goldman, supra.
Plaintiff-appellee places herself into three classes that receive different treatment. First, she is a member of the group of those victims who have been injured by governmental medical tortfeasors and thus she is automatically subject to the $500,000 *1010 limitation. Conversely, the victims of those private medical tortfeasors who have not qualified under La.R.S. 40:1299.42 are not subject to a limitation. Qualification of private doctors and hospitals is voluntary. Secondly, she belongs to the class of those victims who are the most seriously injuredthere is a good possibility that future medical expenses alone will outstrip the top award available of $500,000. Lastly, she maintains that as a victim of the state's medical employees' tortious acts, she is denied full redress for her injuries while victims of other state employees' negligence are not. We agree with plaintiff that these classifications are present.
We cannot say, however, that the statute involves a suspect class or impinges upon a fundamental right. Suspect classes are those so recognized by the Supreme Court, and they involve classifications based on race, alienage, national origin, or some other attribute held by discrete and insular minorities. Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). United States v. Carolene Product Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938); Chabert v. Louisiana High School Athletic Ass'n, 323 So.2d 774 (La.1975). Patients of state health care providers are not included within this list of suspect classes.
The number of fundamental rights is likewise finite. Those that have been recognized include free speech, voting, interstate travel, fairness in the criminal process, fairness in procedures concerning governmental deprivations of life, liberty or property, and privacy. NAACP v. Alabama ex rel Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Mayer v. City of Chicago, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).
The right to recover the full extent of damages one is owed from a tortfeasor is not on this list. Moreover, our Supreme Court's rulings in Bazley v. Tortorich, supra, which held that the right to sue in tort for full recovery for one's injuries was not a fundamental right, and Burmaster, v. Gravity Drainage Dist. No. 2, 366 So.2d 1381 (La.1978), which reiterates the rule that the legislature may regulate and even abolish causes of action before they become vested, warrants the continued exclusion of plaintiff's asserted right from that list.
Therefore, we must apply the minimal test of whether there is a valid state purpose which is reasonably furthered by these legislative classifications.
The articulated purposes for the limitation of the state's liability for the negligence of certain state health care providers are to lower the cost of health care services generally and to assure the availability of medical care for the citizens of the state through state services. That these are legitimate goals can hardly be refuted. Thousands of state residents depend upon the free or inexpensive medical service provided by state government. If, due to a shortage of funds in the state's coffers, fees were charged where none were, or present services were cut back, some of these patients might not have access to medical treatment.
The limitation of the state's liability in malpractice cases to $500,000 is a reasonable legislative response to this perceived danger. Though we have not been supplied with statistics either as to the frequency of damage awards that exceed $500,000, or as to by how much such awards surpass that figure, we cannot say that this limitation is irrational. Preventing some patients from recovering the full amount they would otherwise receive for their injuries so that more patients may continue to receive needed treatment does not offend the constitutional guarantee of equal protection. We are reminded that "(t)he problems of government are practical ones and may justify, if they do not require, rough accomodations,illogical, it may be, and unscientific." Metropolis Theater Co. v. Chicago, *1011 228 U.S. 61, 69-70, 33 S.Ct. 441, 443, 57 L.Ed. 730, 734 (1913).
It is also true that this limit on liability affects only victims of the state's medical employees' negligence; for example, plaintiffs who sue the state because its employees were negligent in allowing defective conditions on highways to exist are not so restricted. Again, however, we decline to superimpose our notions of wisdom upon the legislature. Keeping in mind that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," and that "the legislature may select one phase of one field and apply a remedy there, neglecting the others," we find no fault of sufficient gravity in the legislative decision to mandate our declaring it invalid. Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955).
Inequality is again found when a comparison is made of victims of governmental medical tortfeasors, such as plaintiff, and those victims of private medical tortfeasors who have not qualified under La.R.S. 40:1299.42. Only those private health care providers who have voluntarily qualified by following certain procedures enjoy the limitation of liability provision. The court, in Everette v. Goldman, supra, held that the legislature's decision to allow private doctors to decide for themselves whether to join the plan is rational and that therefore there was no unfair discrimination against patients of doctors who had not qualified. We do not see then how the classification created here could be called unfair. All patients of the state health care providers named in La.R.S. 40:1299.39 A(1) should know that they are subject to the limitation, whereas patients of private health care providers (the class in Everett) will not know if their doctors have qualified and thereby are protected by the limitation (unless those doctors inform the patients, of course). The legislature has done no more than to give the state the benefit of the same limitation it has given private health care providers who choose to qualify.
We have examined decisions from other jurisdictions which have struck down their respective states' malpractice limitation of liability statutes. Courts in New Hampshire, Illinois, North Dakota and Ohio have declared laws that establish ceilings on private health care providers' liabilities to be violative of the equal protection guarantee. Carson v. Maurer, 120 N.H. 925, 424 A.2d 825 (N.H.1980); Wright v. Central DuPage Hospital Association, 63 Ill.2d 313, 347 N.E.2d 736 (Ill.1976); Arneson v. Olson, 270 N.W.2d 125 (N.D.1978); Simon v. St. Elizabeth Medical Center, 3 O.O.3d 164, 355 N.E.2d 903 (Oh.1976). We find these decisions to be unpersuasive.
Included in those decisions and within plaintiff's argument in brief are reliances upon the quid pro quo doctrine. The plaintiff maintains that taking away her right to be fully compensated for injuries and giving nothing in return is a violation of this principle. In Everett, supra, the Supreme Court quelled notions that such a doctrine existed in Louisiana, and stated that no constitutional principle would be offended by a law which abrogates a previously existing right while giving no substantial benefit to take its place. Plaintiff's argument therefore lacks merit. See New York C.R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917).
Because we find that a valid governmental interest is reasonably furthered by the statute's classifications, the limitation of liability provision does not violate the equal protection clauses of the state and federal constitutions.

DUE PROCESS
Plaintiff claims that La.R.S. 40:1299.39 B violates the due process clause of the Louisiana Constitution. La. Const. art. I, § 2.
Under our jurisprudence, substantive due process analysis differs little from that of equal protection. The test, where no fundamental civil rights are at issue, is whether the statute involved is reasonable in relation to the goal to be attained and is adopted in the interest of the community as *1012 a whole. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); Bazley v. Tortorich, supra.
The direct limitation on liability that the legislature has granted to the state in malpractice cases is designed ostensibly to insure that state medical services will remain available at low or no costs to the citizens of Louisiana. It is hoped that this ceiling on awards will save the state funds necessary to attain this goal.
We acknowledge that this approach is blunt and crude. Plaintiffs, such as Ms. Williams here, will be denied legally cognizable damages after having followed strict standards of proof in making out their claims.[7] But the legislature, acting for the benefit of the community as a whole, has chosen these means, among others, to attain a valid end. If state services were curtailed, private health care providers might not be able to handle the increased load of patients that they would no doubt receive; as noted above, other patients not able to afford private care would be deprived of any medical treatment. These dangers, whether pressing or not at the present, are of sufficient magnitude in themselves to warrant our deferential stance towards the statute. The principle of judicial nonintervention in the legislative process, however, compels our decision today. La.R.S. 40:1299.39 B does not deny due process.

ACCESS TO THE COURTS AND SPECIAL LAWS
Plaintiff claims that the statute violates the prohibition against special legislation found in Article III, Sec. 12(A)(7) of the State Constitution, and that it also denies open access to the courts, a right guaranteed by Article I, Sec. 22. She does not construct an argument outlining how the law contravenes those constitutional provisions, but merely makes the bald assertion that it does.
Since we are without the benefit of such an argument, we find no merit in these contentions. We will not supply plaintiff's reasoning for her. We do not see how plaintiff's access to the court is hindered, nor do we find that this limitation of liability provision constitutes a special law.[8]

DAMAGES
The trial judge, following La.R.S. 40:1299.39 B, limited the damage award for Roderick's injuries to $500,000. He did not enumerate the amount of each element of damage, but stated merely that damages "clearly exceed" the statutory limit.
The defendant-appellant maintains that this figure is an excessive award. The loss of future earnings suffered by Roderick is not disputed. Dr. Randy Rice of Louisiana State University testified that this sum is $346,535.00, which represents the amount Roderick would have earned working at a minimum wage salary for 43 years (the average work life expectancy), starting work at age 18.
General damages, those for the pain, suffering, and disability of Roderick, are not so certain. This highly subjective element of damages is impossible to mathematically determine.
Since we hold that the limitation of liability provision in La.R.S. 40:1299.39 B applies here and that it is also constitutional, it is not necessary to enumerate the exact amount that the plaintiff would have been *1013 awarded absent such a limitation. If suffices to say that the damages for pain and suffering and disability added to the loss of future earnings equals an amount well over $500,000. Thus we pretermit discussion of whether future medical expenses are owed, a closer question.[9]
LKCH next attacks the award of $25,000 to Gloria Williams individually for failure to obtain her informed consent before performing the vaginal delivery as being excessive.
Damages have been awarded to a patient who was operated upon when no consent was obtained even though the surgery was skillfully performed. In Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.1978), the plaintiff's fallopian tubes were tied, producing possibly permanent sterility, when she underwent surgery to deliver her baby by a Cesarean Section. The plaintiff received $25,000 in damages for the doctor's failure to obtain her consent to tie the tubes.
Though the trial court's award to Ms. Williams might be considered high, it is not excessive under the circumstances.
Therefore, for the above and foregoing reasons, the judgment of the trial court is affirmed at defendant-appellant's costs in the amount of $5,035.16.
AFFIRMED.
NOTES
[1] The particular specifications of error as assigned by defendant LKCH are as follows:

1. The trial judge manifestly erred in finding a causal connection between the failure to use the electronic fetal heart monitor and the damages alleged to have been sustained by the plaintiff.
2. The trial judge committed manifest error in finding that the fetal heart tones were taken only twice rather than every thirty minutes based solely upon the fact that said heart tone checks were not entered on the patient's hospital record.
3. The trial judge manifestly erred in finding that the attending physicians were negligent in failing to use Piper forceps during the delivery.
4. The trial judge committed manifest error in finding that the failure to perform a Cesarean section was negligence which was a contributing proximate cause of the child's condition.
5. The trial judge committed manifest error in finding that the failure to have x-ray pelvimetry made was negligence which was a contributing proximate cause of the child's condition.
6. The trial judge manifestly erred in finding that the doctors involved, Drs. Yamaguchi and Sherrod, were "specialists" within the meaning of LSA-R.S. 40:1299.39 A(4), and are not entitled to the benefits of the "locality rule".
7. The trial judge manifestly erred in finding that Roderick Williams suffered head dystocia during the delivery for approximately five minutes.
8. The trial judge manifestly erred in finding that Gloria Williams suffered damages individually as a result of the failure of the physicians to obtain her informed consent prior to vaginal delivery.
9. The trial judge manifestly erred in finding that the plaintiff proved by a preponderance of the evidence that the delivery of the baby's head was prolonged due to acts or omissions on the part of the doctors at Lallie Kemp Charity Hospital.
10. The trial court manifestly erred in finding that both parents of the child were normal and without mental health or retardation problems.
11. The trial judge manifestly erred in failing to find that Roderick Williams suffers from a genetic disorder.
12. The trial judge manifestly erred in awarding damages in excess of the $500,000.00 statutory limit imposed by LSA R.S. 40:1299.39.
13. The trial court awarded excessive damages for Roderick Williams's injury.
[2] La.R.S. 40:1299.39 as amended by 1978 La. Acts, No. 611, § 1, reads as follows:

"A. As used in this Part:
"(1) `Person' means any individual acting in a professional capacity in providing health care services, by or on behalf of the state, and shall include but not be limited to a physician, psychologist, dentist, registered nurse, licensed practical nurse, pharmacist, optometrist, podiatrist, physical therapist, laboratory or x-ray technician, acting within the course and scope of his employment, pursuant to a contract with the Department of Health and Human Resources which contract specially names that health care provider, for professional services or to render other health care services, health care facility staff appointment, or assignment for or on behalf of the state, whether he receives compensation or not, without regard to where the services are performed, or performing voluntary professional services in a health care facility or institution for or on behalf of the state, or a resident, intern, or student, of any discipline listed herein who is assigned as a part of his prescribed training when acting within the course and scope of his assigned training or staff appointment, without regard to where the services are performed.
"(2) `Physician' means a person with a license or permit to practice medicine in this state.
"(3) `Patient' means a natural person who receives or should have received health care from a person covered by this Part.
"(4) `Tort' means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locale, and to use reasonable care and diligence, along with his best judgment, in the application of his skill; provided, however, that in the case of a health care provider practicing in a recognized field of specialty, the standard of care in rendering professional services or health care to a patient shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of that specialty in good standing, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
"(5) `Malpractice' means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient.
"(6) `Health care' means any act or treatment performed or furnished or which should have been performed or furnished by any person covered by this Part for, to, or on behalf of, a patient during the medical care, treatment or confinement of the patient.
"B. Limitation of liability. Notwithstanding any other provisions of the law to the contrary, no judgment shall be rendered, and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interests and costs.
"C. Coverage. Notwithstanding any other provision of the law to the contrary, the state shall pay any damages, interest, cost of investigation and defense, and any other costs in connection with any claim lodged against any health care provider (`person' as defined herein) for an alleged act of medical malpractice, resulting in the injury or death of a patient up to the limits set forth in this Part. The coverage provided herein shall apply only when the health care provider (`person' as defined herein) is acting within the course and scope of his employment, pursuant to a contract to render health care services, health care facility staff appointment, or assignment by or on behalf of the state, whether he receives compensation or not, without regard to where the services are performed; or while he is providing voluntary professional services in a health care facility or institution by or on behalf of the state, or a resident, intern or student, of any discipline listed in this Part who is assigned as a part of his prescribed training when acting within the course and scope of his assigned training or staff appointment, without regard to where the services are performed.
"D. All malpractice claims against the state shall be submitted to and administered by the Division of Administration. In the administration of such claims, the Division of Administration shall cause a timely and thorough investigation of the circumstances surrounding each malpractice claim, assemble all data relevant thereto, and coordinate with legal counsel designated by the attorney general for the defense of such cases. With the approval of such legal counsel, the Division of Administration may compromise and settle any suit or claim up to the limits set forth in this Part. Provided further that in any suit or claim brought pursuant to this Part, the Division of Administration shall have the authority to pay all defense and investigative costs, and any other costs incurred in connection with the defense of these actions as said costs accrue.
"E. The attorney general shall, with the concurrence of the Division of Administration, designate an attorney experienced in the defense of medical malpractice claims to act as legal counsel for the Division of Administration in the defense of claims filed under this Part. The attorney general shall establish a fee schedule providing for payment of attorneys under contract on an hourly fee basis, except for the claims designated in Subsection F. Any written compromise or settlement effected between the state and the claimant with the approval of legal counsel designated by the attorney general shall be binding upon the claimant and the state subject only to the approval of such compromise or settlement by the district court of the parish where the claimant is domiciled or the state capital is domiciled. The petition seeking court approval shall recite the essential facts alleged to constitute malpractice, the damages sustained, and the amount to be paid the claimant. The petition shall be executed by the claimant or his attorney and by legal counsel for the state. The court shall render and sign immediately a judgment, if it finds from an examination of the petition, attached exhibits, if any, and statements of the parties that the compromise or settlement is in the best interest of the state. At the first session of the legislature following the rendition of such judgment, the Division of Administration shall cause to be introduced a bill appropriating money to pay said judgment.
"F. The Division of Administration, with the concurrence of appointed counsel, shall have the authority to compromise or settle, and pay any suit or claim brought pursuant to this Part up to $25,000.00 exclusive of interest and costs, without regard to the procedures outlined in Section E above.
"G. Any person covered by this Part shall be considered as a named insured, and the coverage provided herein shall be primary."
[3] See 1976 La.Acts, No. 66, adding La.R.S. 40:1299.39; 1976 Acts, No. 660; 1977 Acts, Nos. 628 and 744; 1978 Acts, No. 611; all amending La.R.S. 40:1299.39. (Supp.1976). See also The Work of the Louisiana Legislature for the 1978 Regular Session, 39 La.L.Rev. 101, 194 (1978).
[4] U.S. Const.Amend. XIV, § 1; La. Const. art. I, § 2, § 3.
[5] La. Const. art. I, § 22.
[6] La. Const. art. Ill, § 12.
[7] See 50 Tul.L.R. 655, 667 for a criticism of the limitation of liability provision in La.R.S. 40:1299.42 (B)(1).
[8] Article III, Sec. 12(A)(7) reads as follows:

"(A) Prohibitions. Except as otherwise provided in this constitution, the legislature shall not pass a local or special law:
* * * * * *
"(7) Creating private corporations, or amending, reviewing, extending, or explaining the charters thereof; granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity."
There is no prohibition against limiting the state's liability here.
Article I, Section 22 of the Constitution reads:
"All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person property, reputation or other rights."
[9] Roderick was admitted into Hammond State School after Ms. Williams realized she was unable to care for him properly at home. He remains there to this day. Ms. Williams requests an award equal to the cost of retaining round-the-clock nursing care at her home in Independence, Louisiana, some ten miles from the State school. LKCH maintains that there is no need for such an award because Roderick will be cared for by the state at no cost to the plaintiff.