469 So.2d 264 (1985)
Lydia BANDA
v.
Dr. Dwight S. DANBURG, Doris C. Gaudin, P.H.N., and the State of Louisiana, through the Department of Health and Human Resources.[1]
No. 84 CA 0120.
Court of Appeal of Louisiana, First Circuit.
April 16, 1985.
*265 Arthur Cobb, Baton Rouge, for plaintiff-appellant, Lydia Banda.
John L. Avant, Baton Rouge, for defendant-appellee Dr. Dwight S. Danburg, et al.
Before COLE, CARTER and LANIER, JJ.
CARTER, Judge.
This is a suit for damages for medical malpractice.[2]

FACTS
On or about March 12, 1979, plaintiff, a thirty-four-year old Rhodesian female, was evaluated by the East Baton Rouge Parish Health Unit.[3] Plaintiff had a positive skin test for tuberculosis at that time and a history of a negative Heaf test in 1965. On March 30, 1979, plaintiff was referred to the Baton Rouge Regional Chest Clinic for institution of chemoprophylaxis. Although plaintiff had a negative chest x-ray and was essentially asymptomatic from a pulmonary standpoint, it was determined that plaintiff was a tuberculin converter, i.e. she had been infected with tuberculosis, but the disease was inactive. As preventative treatment, Dr. Danburg of the Baton Rouge Regional Chest Clinic prescribed the drug isoniazid hydrogize (INH), which plaintiff began taking on May 18, 1979.
On August 17, 1979, plaintiff's husband reported to the parish health unit that plaintiff was complaining of occasional nausea *266 and headaches. She was instructed not to take INH on an empty stomach.
On September 21, 1979, plaintiff called the parish health unit complaining of diarrhea and nausea, but denied any discoloration of her urine or sclera, and expressed concern that the symptoms were caused by the INH treatment. She was instructed to discontinue the treatment for several days until the diarrhea stopped and then to resume treatment. Plaintiff was also advised to consult a physician if the symptoms persisted.
On September 24, 1979, plaintiff notified the parish health unit that on the evening of September 21, 1979, she noticed for the first time that her eyes appeared jaundiced. She reported to Earl K. Long Hospital, where she was admitted overnight for tests. She was diagnosed as having hepatitis, secondary to the INH medication. Dr. Roy, the admitting physician, instructed plaintiff to discontinue the INH until she could be seen by the regional chest clinic.
When plaintiff was seen by Dr. Danburg at the regional chest clinic on October 3, 1979, she admitted having had some feeling of malaise and general tiredness for a week or two prior to developing the symptoms which precipitated her hospital admittance. Plaintiff was instructed to have a complete liver evaluation and to be evaluated by a private physician.
On October 23, 1979, plaintiff's husband reported that plaintiff had been admitted to Our Lady of the Lake Hospital with liver damage.
Plaintiff subsequently filed suit for damages against Dr. Dwight Danburg and Nurse Doris Gaudin, alleging that they were negligent in failing to carefully monitor plaintiff, and against the State of Louisiana, Through the Department of Health and Human Resources, under the doctrine of respondeat superior for the negligence of Dr. Danburg and Nurse Gaudin.
The trial judge determined that plaintiff failed to meet her burden of proof in a medical malpractice action under LSA-R.S. 9:2794[4], in that she failed to prove that Dr. Danburg[5] either lacked the degree of knowledge or skill possessed by others similarly situated or did not use reasonable care and diligence in dispensing the drug INH to the plaintiff and that she suffered injuries that would not otherwise have occurred, but for the alleged negligence of *267 Dr. Danburg, an employee of the State of Louisiana, Through the Department of Health and Human Resources. Accordingly, the trial judge dismissed plaintiff's suit.
From this judgment, plaintiff appeals, alleging that the trial court erred in finding Dr. Danburg was not negligent.

ARGUMENT
Plaintiff contends that Dr. Danburg failed to properly monitor plaintiff for signs of hepatitis during the course of the INH treatment. Plaintiff reasons that this failure to properly monitor her condition constituted medical malpractice, thereby making Dr. Danburg, and therefore the State of Louisiana, liable for plaintiff's damages.
The Louisiana Supreme Court set forth the standard of care to which a specialist is held in Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331, 1340 (La.1978) as follows:
[A] medical specialist is required by La. Civil Code Articles 2315 and 2316, and La. R.S. 9:2794, to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty....
See also LSA-R.S. 40:1299.39(A)(4); Forstall v. Hotel Dieu Hosp., 429 So.2d 213 (La.App. 4th Cir.1983), writ denied 433 So.2d 1054 (La.1983); Babin v. St. Paul Fire and Marine Ins. Co., 385 So.2d 849 (La.App. 1st Cir.1980), writ denied 386 So.2d 358 (La.1980); Steele v. St. Paul Fire & Marine Ins. Co., 371 So.2d 843 (La.App. 3rd Cir.1979), writ denied 374 So.2d 658 (La.1979); White v. Edison, 361 So.2d 1292 (La.App. 1st Cir.1978), writ denied 363 So.2d 915 (La.1978).
In a medical malpractice suit, plaintiff bears the burden of establishing the physician's deviation from the standard of care required by others in the same field or speciality. Ardoin v. Hartford Acc. & Indem. Co., supra; White v. Edison, supra. Plaintiff must also establish a causal relationship between the physician's alleged negligence and the injury resulting therefrom. White v. Edison, supra; Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir.1975), writ denied 321 So.2d 363 (La. 1975).
In the instant case, Dr. Danburg testified that plaintiff was placed on chemoprophylaxis because he determined that she was a tuberculin converter, that she was in a high risk group, i.e. she worked as a nurse's aide in a nursing home, that in her age group only 3% develop hepatitis from the INH treatment (and only 1% experience permanent liver damage as a result of the hepatitis), and that, without treatment, plaintiff faced a four times greater chance of developing tuberculosis than of developing hepatitis from the INH treatment.
As a precaution, Dr. Danburg, prior to prescribing INH treatment, performed S.G. O.T. tests to determine plaintiff's liver function. Upon receiving satisfactory results, Dr. Danburg placed plaintiff on 300 milligrams of INH daily for one year.
Dr. Danburg acknowledged that good medical practice requires careful monitoring of a patient on INH. In furtherance of this objective, Dr. Danburg developed a system whereby his patients could be monitored monthly through the joint effort of the parish health unit and the regional chest clinic. The procedure operates as follows: Patients are given INH in one month dosages. When they return to the parish health unit to pick up the next month's supply, they are asked numerous questions regarding side effects they may be experiencing.[6] The information received, if pertinent, is then relayed to the regional chest clinic for evaluation.
*268 Dr. Danburg and Nurse Gaudin could not specifically recall telling plaintiff of each and every side effect, but both testified that it was normal procedure for both of them to tell the patient the possible side effects of INH and to instruct the patient to pick up the medication monthly from the health unit and to report any side effects to the parish health unit.
The documentary evidence, specifically the parish health unit's monthly drug sheets, the parish health unit's nurses notes, and the regional chest clinic's progress notes, clearly established that plaintiff made no complaint to Dr. Danburg, the parish health unit, or the regional chest clinic of any adverse side effect to the INH, except on two occasions. The first such instance occurred on August 17, 1979, when plaintiff complained of nausea and headaches and was advised not to take INH on an empty stomach. The second instance took place on September 21, 1979, when plaintiff reported diarrhea and nausea, but denied any discoloration. At this time she was instructed to discontinue the INH until the symptoms ceased, but to consult a physician if the symptoms persisted.
Plaintiff, however, testified as follows: At her first appointment with Dr. Danburg on May 18, 1979, she was told she would have to undergo INH treatment and that there were some side effects, like headaches, nausea, malaise, general body tiredness, and skin discoloration. Plaintiff was told that if she developed any of these symptoms, she was to report it to Nurse Hinz at the parish health unit, and she understood that she was to pick up her INH medication at monthly intervals. Plaintiff made several phone calls to the parish health unit in early August, 1979, but was unsuccessful in contacting Nurse Hinz. She admitted that she talked to Nurse Wright at the parish health unit and complained of nausea. She was instructed to take the INH after breakfast and that if the nausea persisted, she should take the INH after her bedtime meal. Then on September 21, 1979, plaintiff called the parish health unit and reported symptoms of diarrhea, nausea, headaches, and jaundice. Upon receiving no instructions, plaintiff went to Earl K. Long Hospital, was instructed to discontinue the INH treatment, and was admitted for testing.
Plaintiff's husband testified that he picked up the INH every month. He testified that he was not asked a checklist of questions, but that the nurses merely asked if he or his wife had any complaints. Mr. Banda also testified that his wife appeared jaundiced during the second week in August and that four days later she had to be taken to Earl K. Long Hospital.
Defendant's expert in pulmonology, Dr. Clay Waggenspack (the only expert, other than Dr. Danburg, called to testify regarding the standard of care), testified that it is not necessary for the physician to see a patient undergoing INH treatment every month to achieve proper monitoring. Dr. Waggenspack indicated it was sufficient to have the patient call the physician's office monthly to advise the doctor of any complaints.
With regard to the advice given plaintiff upon reports of her symptoms, Dr. Waggenspack testified that nausea usually indicates gastrointestinal intolerance to the INH, and he usually advises the patient to take it after breakfast. He also opined that he would not have discontinued the INH upon a patient's complaint of diarrhea and nausea, especially in light of the denial of any discoloration of the urine, skin, or sclera.
In assessing the care given plaintiff in the present case, Dr. Waggenspack opined that Dr. Danburg had gone beyond what the standard of care required in treating plaintiff. He explained that, in his opinion, Dr. Danburg was more diligent and exercised more care in monitoring and treating the plaintiff than is expected of a physician in his field of expertise.
The trial judge determined that plaintiff failed to prove that Dr. Danburg did not use reasonable care and diligence in monitoring plaintiff and dismissed her claim. In view of the evidence, this determination *269 by the trial judge was not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
For the above reasons, the judgment of the trial court is affirmed. Plaintiff is cast for the costs of this appeal.
AFFIRMED.
NOTES
[1] State of Louisiana, Through the Department of Health and Human Resources was incorrectly referred to in the pleadings as "The Baton Rouge Chest Clinic and the East Baton Rouge Health Unit, Division of Louisiana Health and Human Resources."
[2] The trial in the instant case was bifurcated and tried only on the issue of liability.
[3] While attending LSU, plaintiff's husband was referred by the university infirmary to the East Baton Rouge Parish Health Unit for tuberculosis tests. Upon determining that Mr. Banda had a positive tuberculosis skin test, it was recommended that plaintiff and her three children also be tested.
[4] LSA-R.S. 9:2794 provides:

A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
B. Any party to the action will have the right to subpoena any physician or dentist either for a deposition and/or testimony for trial to establish the degree of knowledge or skill possessed or degree of care ordinarily exercised as described above without obtaining the consent of the physician or dentist who is going to be subpoenaed. The fee of the physician or dentist called for deposition and/or testimony under this Section will be set by the court.
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician or dentist. The jury shall be further instructed that injury alone does not raise a presumption of the physician's or dentist's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
[5] At the close of plaintiff's case, Nurse Doris Gaudin was dismissed by a directed verdict. No appeal was taken from her dismissal. Therefore, that issue is not before us on appeal.
[6] The following symptoms, which are listed on the checklist and which the patients are routinely questioned about, are as follows:
a. peripheral neuritis
b. vertigo
c. toxic psychosis
d. jaundice
e. dryness of mouth
f. malaise
g. muscular twitching
h. fever
i. impaired vision
j. drowsiness
k. change in urine
l. euphoria
m. rash
n. nausea