446 So.2d 760 (1983)
Henry A. SIBLEY, III, Curator of Jane Elizabeth Sibley, Interdict
v.
The BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE.
No. 83-CA-0411.
Court of Appeal of Louisiana, First Circuit.
December 30, 1983.
Rehearing Denied February 28, 1984.
Writ Granted May 25, 1984.
*761 David W. Robinson, and Steve Marks, Baton Rouge, for plaintiff-appellant.
Vincent Fornias, Baton Rouge, for defendant-appellee.
Before LOTTINGER, EDWARDS and ALFORD, JJ.
*762 EDWARDS, Judge.
Henry A. Sibley, III, brother and curator of Jane Elizabeth Sibley, sued the Board of Supervisors (the Board) of Louisiana State University and Agricultural and Mechanical College (LSU) and Louisiana Health Services, doing business as Blue Cross,[1] for injuries suffered by Ms. Sibley during her hospitalization and treatment in the psychiatric ward of the Confederate Memorial Medical Center (Confederate), owned by the State and operated by the Board as an adjunct to the Louisiana State University Medical Center (LSUMC) in Shreveport.[2]
Plaintiff successfully proved at trial that Ms. Sibley was misdiagnosed at Confederate for psychotic depression and wrongly administered certain antipsychotic drugs, called neuroleptics, over a period of five weeks in dosages and combinations which reached toxic levels in her bloodstream. Weakened and poisoned by the drugs, she eventually suffered a cardiopulmonary arrest. She survived but during the crisis, her brain was deprived of oxygen and she suffered massive permanent brain damage as a result.
The trial court rendered judgment in favor of the plaintiff, but under the provisions of LSA-R.S. 40:1299.39 limited the defendant's liability to $500,000.00. Plaintiff appeals this judgment, contending that the limitation of liability in LSA-R.S. 40:1299.39 is not applicable because of the independent "corporate" negligence of Confederate. He also argues that if LSA-R.S. 40:1299.39 is applicable, its limitation of liability provision violates Article XII, Section 10(A) of the Louisiana Constitution.
The following facts, presented in some detail, are undisputed. During the summer of 1980, Jane Sibley, 19 years old, was living in Shreveport, Louisiana, with her great-aunt and uncle and working at Willis-Knighton Hospital. She had been living with her mother and sister in Baton Rouge, and had briefly attended LSU there, but her mother's alcoholism along with other family problems had caused her to move away. She returned home for a visit over the 4th of July weekend. Something happened over that weekend which was never brought out at trial, and which apparently precipitated Ms. Sibley's subsequent mental illness. After she returned to Shreveport, within a very short time she became increasingly withdrawn and uncommunicative. Her co-workers noticed a change in her normally cheery disposition and neat appearance. Diane Andrews, her supervisor at Willis-Knighton had her examined by a hospital physician who immediately referred her to Dr. George Seiden, a private psychiatrist who practices out of Brentwood Hospital, a private mental health facility in Shreveport.
Dr. Seiden diagnosed her condition as reactive depression, an affective disorder in which changes in a person's mood are caused by external or environmental stresses, and which is distinguished from endogenous depression which results from internal or biological changes affecting one's mood or emotional state independent of any environmental stresses or stimuli. He prescribed no medication for her treatment, opting instead for psychotherapy.[3] He treated her for three weeks, from mid-July to August 7, before financial difficulties necessitated her transfer to Confederate.
On August 7, 1980, under an emergency certificate of commitment, Ms. Sibley was transferred to the psychiatric ward on the tenth floor of Confederate.[4]
*763 In the psychiatric service, two teams are responsible for treatment of the patients. Each is headed by a faculty psychiatrist responsible for supervising and training the residents, assigned to the team on a rotating monthly basis as part of their training. Each team also includes at least one social worker and a staff psychologist. Medical students are also assigned to the team as part of their education to learn about psychiatry. According to the testimony elicited at trial, the team system at LSUMC is not fundamentally different from that employed by teaching hospitals throughout the country.
Dr. Joel L. Steinberg, staff member and assistant professor of psychiatry at LSUMC, headed the team assigned to Ms. Sibley. He obtained his medical degree (M.D.) in 1974 and was appointed to the faculty in 1979. He was assisted by resident Dr. Mary Jo Fitzgerald, who obtained her M.D. on May 31, 1980, and had been assigned to the team on August 1, 1980, and by resident Dr. Mitchell Stevens, who obtained his degree in 1978, and who replaced Dr. Fitzgerald on September 1. Also assigned to the team was Susan Pintado, a medical student expecting her degree in 1982. Each of these individuals was under the direct supervision of Dr. Steinberg, who maintained throughout trial that all the dosages were administered in accordance with his directions and approval.
Dr. Seiden telephoned Dr. Fitzgerald at Confederate and related to her Ms. Sibley's problem and history. After conducting a physical and mental examination, Dr. Fitzgerald agreed with Dr. Seiden's diagnosis of depression and made the appropriate notations in the hospital record. The following day, August 8, Ms. Sibley was seen on rounds by the entire team. On the basis of what he observed to be signs of catanoia and delusions, Dr. Steinberg changed the diagnosis to "acute unspecified psychosis," with "possible schizophreniform disorder" and immediately placed her on neuroleptic therapy.
According to Dr. Frank J. Ayd, a psychiatrist and a world-renowned expert and pioneer in the field of psycho-pharmacotherapy (the treatment of disorders of the central nervous system through the use of psychotropic drugs), neuroleptic drugs (also known as major tranquilizers, antipsychotic agents and psychotropic medications), chemically affect the central nervous system, altering thought processes and producing dramatic physical effects in the body. Neuro-transmitters, or chemical agents in the brain, control and keep in balance the dopaminergic and cholinergic systems of the body. The dopaminergic system, so-named for the neuro-transmitter dopamine, controls body movements and muscle tone. The cholinergic system, named for the neuro-transmitter acetylcholine, controls the vegetative and secretory functions of the body, including digestion, perspiration, urination and exretion. All neuroleptics, regardless of their chemical group, impede the flow of dopamine from the brain, resulting in the depression of the dopaminergic system. When the dopaminergic system is chemically depressed, the patient will develop certain physical reactions or side effects from the drugs, including akinesia, akathisia, dystonia and parkinsonism. These symptoms are collectively designated as "extrapyramidal signs" (EPS), which may require additional medication, such as benadryl, to counteract.
Neuroleptic drugs upset the balance between the dopmainergic and cholinergic systems. When this happens, the body will experience an increase in cholinergic activity, which will result in an increasing, and sometimes rapid, loss of body fluids as the body attempts to compensate. Depending upon the severity and rapidity of the loss, the patient may require anti-cholinergic medication to suppress the heightened cholinergic activity and restore the balance. If not closely monitored, the cholinergic system may be depressed too much, and the balance may swing too far in the other direction. The body could develop a central anti-cholinergic syndrome (CAS), a combination of symptoms indicating an excessive and dangerous inhibition of the cholinergic functions. CAS can cause severe physical damage and death. To counter CAS, certain *764 drugs, such as Symmetrel, can be administered to raise the level of depression on the dopaminergic system by countering the effects of the neuroleptics.
Because of the potentially dangerous side effects associated with the use of neuroleptic therapy, Dr. Ayd testified that such drugs should not be administered in the absence of a clear clinical justification, such as definite signs of psychosis or extreme agitation rendering the patient unmanageable. Although Dr. Steinberg attempted at trial to justify his diagnosis of psychosis and his institution of neuroleptic therapy, the record clearly demonstrates, and the parties do not dispute the finding, that Ms. Sibley was misdiagnosed and mistreated for psychosis with a myriad of neuroleptic drugs and anti-cholinergic medications which resulted in an anti-cholinergic crisis and a cardio-pulmonary arrest on September 15, 1980.
Apart from Dr. Steinberg's initial misdiagnosis and the unwarranted institution of neuroleptic therapy, Dr. Ayd specifically criticized the team's practice of what he called polypharmacy, that is, the use of more than one medication to treat a disease. During her confinement in the psychiatric ward, she was administered no less than four potent neuroleptic drugs, including haldol and navane, equally potent neuroleptics registering nine on a scale of ten. These drugs produced extrapyramidal reactions in Ms. Sibley necessitating the administration of other drugs, principally benadryl, to counter act the side effects. It was also necessary to administer anti-cholinergic drugs to suppress the loss of body fluid as a result of the administration of the neuroleptic drugs. Dr. Ayd testified that the use of these drugs in combination masked signs of a growing drug toxicity and an emerging anti-cholinergic crisis. He charged the doctors of treating symptoms rather than a specific disorder. He testified that a cardinal rule in psychiatry is to assume that any symptom manifesting itself after the institution of medication is a result of the drug rather than a symptom of a disease. None of the doctors involved, but especially Dr. Steinberg, who had ultimate responsibility for the treatment of Ms. Sibley, heeded that rule.
At 5:45 a.m., on September 15, 1980, Ms. Sibley went into a cardiopulmonary arrest. Her breathing became shallow and irregular, her blood pressure dropped, her pulse rapidly increased. Her rectal temperature reached 108 degrees Farenheit. Her breathing eventually stopped. She was transferred to the intensive care unit in the medical service, and there her condition was stabilized. She survived, but is permanently and severely brain damaged. In December of that year she was transferred to Brooke Army Medical Center at Fort Sam Houston, Texas, and from there to the Annex at Baton Rouge General Hospital, a facility for the treatment of non-ambulatory patients, where she is currently being cared for.
There is no question but that the present suit involves a clear case of malpractice on the part of Dr. Steinberg and the other members of the team. In his reasons for judgment, the trial court said, "and this is a malpractice, basically a malpractice caseCall it what you want, but that's what it is." The court found no difficulty in finding liability, nor do we, nor do the parties, since liability is not at issue on appeal. Plaintiff objects rather to the application and the constitutionality of the limitation of liability provision found in LSA-R.S. 40:1299.39.[5]
In Williams v. Lallie Kemp Charity Hospital, 428 So.2d 1000 (La.App. 1st Cir. 1983), cert. denied, 434 So.2d 1093 (La. 1983), this court recently affirmed the application of the subject statute in a suit against a state-owned hospital for damages suffered as a result of a negligently performed Caesarian section. Equating the *765 suit against the hospital as a suit against the state, the court reasoned that the legislature intended to cover not only employees of the state providing health care services (through the state-owned hospital), but also the state itself. The court specifically held that the subject statute applies to "suits against the state for alleged acts of malpractice committed by its health care provider employees." Id. at 1009. The court went on to say, however, "LKCH [Lallie Kemp] was not alleged nor found to be independently negligent, but was held liable for the unintentional torts of [the attending physicians] and several of the nurses committed before and during the baby's delivery."
In the present suit, plaintiff has seized upon the cited language in Lallie Kemp to argue that the independent "corporate" negligence of LSU, or more precisely the medical staff at Confederate, renders the hospital directly rather than vicariously liable for Ms. Sibley's damages.[6] Consequently, he argues, the Board, and therefore the state, is liable to the full extent of Ms. Sibley's injuries, alleged to be well in excess of ten million dollars, because the statute does not apply to independently negligent institutions.
Plaintiff's argument is essentially the same as that argued in Lallie Kemp: Since a "hospital" is not included within the definition of "person" in LSA-R.S. 40:1299.39 A(1) and therefore not a health care provider within the meaning of the statute, it cannot benefit from the limitation of liability as provided in LSA-R.S. 40:1299.39 C. Despite plaintiff's reliance on the distinction between direct and vicarious liability in his assertion that Confederate is independently negligent, this case is conceptually indistinguishable from Lallie Kemp and therefore calls for a similar result.
Along with nearly every other state in the union, Louisiana passed its medical malpractice statutes, including that found in LSA-R.S. 40:1299.39, in response to what has been described as the medical malpractice crisis of the '70's.[7] It was feared that unlimited recovery in malpractice claims would make and was, in fact, making malpractice insurance economically unfeasible, and that the availability of medical care would be seriously curtailed. As a result, these statutes were passed to insure the availability of medical malpractice insurance by limiting liability to a specific insurable amount. The specific purpose behind the statute in question is "to insure that state medical services will remain available at low or no costs to the citizens of Louisiana." Lallie Kemp, 428 So.2d at 1012.
This court acknowledged in Lallie Kemp that the legislature's approach was "blunt and crude." Id. at 1012. The court also stated that the valid end sought to be achieved by the legislature on behalf of the community as a whole warrants a deferential, and we add, a liberal stance towards the statute. A narrow or hypertechnical interpretation of the statute would be inconsistent with that approach. Moreover, the legislature's intention to provide as broad a base of coverage as possible is clearly reflected in recent amendments expanding the definition of "person" in LSA-R.S. 40:1299.39 A(1) and reinforces that approach.
In its original form, the definition of "person" read:
"Person" means a physician, dentist, registered nurse, licensed practical nurse, pharmacist, optometrist, podiatrist, physical therapist, laboratory or x-ray technician, acting in the course and *766 scope of his employment, health care facility staff appointment, or assignment for or on behalf of the state, or a resident, intern, trainee or a student of any discipline listed herein who is assigned as a part of his prescribed training when acting in the course and scope of his employment, staff appointment, or assignment for or on behalf of the state.[8]
In 1978, "person" was redefined to mean "any individual acting in a professional capacity in providing health care services, by or on behalf of the state, and shall include but not be limited to" a list of individual professionals that followed.[9] In 1982, the original list was expanded to include clinical social workers and hospital administrators.[10]
The critical language in the 1978 amendment is "shall include but not be limited to." This language clearly reflects the legislature's intention to provide broad coverage of the statute. By holding the statute applicable to suits against the state, this court in Lallie Kemp noted a legislative intent of providing an equally broad application of the statute. Lallie Kemp, 428 So.2d at 1008.
It is true that several jurisdictions have held hospitals directly liable for plaintiffs' injuries under the theory of "corporate negligence," apart from any basis of vicarious liability, and even in the absence of any negligence on the part of the treating physician. As we understand it, corporate negligence has developed in response to three basic factors. First, with the now almost universal abolition of charitable immunity, hospitals are no longer shielded from liability in malpractice claims.[11] Second, by requiring physicians utilizing their facilities to subject their work to staff consultation and review as a condition for obtaining staff privileges, modern hospitals have increasingly injected themselves into the regulation of the medical treatment of the patient, providing medical services beyond the basic accommodations of room and board. Finally, by holding hospitals, by and large operated as separate corporate entities, directly liable in malpractice cases, courts have added hospitals' corporate assets to the pool of assets available for the payment of malpractice claims and increased a plaintiff's chance of recovery. Thus, "the emerging trend is to hold the hospital responsible when the hospital has failed to monitor and review services being provided within its wall." Fridena v. Evans, 127 Arizona 516, 519, 622 P.2d 463, 466 (Sup.1980).
In frank terms, the underlying policy of the doctrine of corporate negligence is to expand malpractice liability, a policy inconsistent with what this court has interpreted to be the legislative purpose behind LSA-R.S. 40:1299.39, namely, to limit liability in the hope of insuring low cost medical care in state health care facilities.
It is significant that Confederate's medical staff, entrusted by the Board with the duty of providing quality medical services to its patients,[12] has no separate corporate status apart from the Board itself. See LSA-R.S. 17:1517; R.S. 17:3351. Thus, there is no separate pool of assets apart from that payable by the state available to the claimants in this case. Each member of the medical staff is now and was in 1978 *767 individually covered by the act. Had the plaintiff sued any one of them directly, there would have been no question as to the statute's application. But, by suing the board only, and by urging the application of the doctrine of corporate negligence, the plaintiff is attempting to preclude the statute's application on the basis of the staff's "collective" liability.
We are unpersuaded by this argument. The state is of course ultimately liable for the payment of the judgment. Since this court has already held in Lallie Kemp that the state is covered by the act, we see no reason to deviate from that decision in this case by the application of the doctrine of corporate negligence. We therefore hold that LSA-R.S. 40:1299.39 applies in any claim against the state that can rationally be classified as one for malpractice, whether based upon the negligence of an individual health care provider or upon the negligence of the medical staff of a state-owned health care facility as a whole.[13] Thus, we affirm the trial court's application of LSA-R.S. 40:1299.39 in this case.
Plaintiff's second argument is that the limitation of liability found in LSA-R.S. 40:1299.39 C, as applied to the state, violates Article XII, Section 10(A) of the Louisiana Constitution, which provides:
Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
Specifically, he argues that any statute which limits the state's tort liability is unconstitutional and cites the following language from Segura v. Louisiana Architects Selection Board, 362 So.2d 498, 499 (La.1978):
Costs of court are part of the "liability" to which a party cast in litigation is subject. As plaintiff in this suit Segura was required to advance costs to the clerks of the courts through which this litigation progressed. These advances, insofar as they have been incurred, and other costs paid by plaintiff and properly chargeable to this suit, would reduce the value of the award in Segura's favor if he could not be reimbursed to that extent. The consequence would be that the State was relieved of part of its liability. The Constitution makes no such concession.
Plaintiff reads Segura too broadly. As we read it, Segura struck down the offending statute, LSA-R.S. 13:4521, only because it attempted to favor the state with a privilege, that is, exemption from payment of court costs, unavailable to other defendants in similar suits, not because it was "limiting" the state's liability with respect to the plaintiff's recovery to the full extent of his injury.
While there may remain questions as to how far Section 10(A) goes in abolishing sovereign immunity in Louisiana,[14] at least within the literal limits of the language, Section 10(A) merely places the state in the same position as any other defendant. It is only when the state attempts to limit its liability on the basis of its status as a sovereign that it violates Section 10(A). Thus, to the extent the legislature may constitutionally limit the liability of any defendant, that same limitation applied to the state is not unconstitutional. See Pratt v. State, 408 So.2d 336 (La.App. 3rd Cir.1981), cert. denied, 412 So.2d 1098 (La.1982); see also Hargrave, "Statutory" and "Hortatory" Provisions of the Louisiana Constitution of 1974, 43 La.L.Rev. *768 647, 653 (1983);[15]cf. Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980).
Thus, the question arises is the limitation of liability constitutional? In Lallie Kemp, this court upheld the constitutionality of the statute against alleged violations of due process and equal protection and the prohibition against special and local laws. It would be fruitless, as well as redundant, to restate all of the reasons given for that holding here. But some of the points mentioned briefly in Lallie Kemp bear repeating.
First, Lallie Kemp noted that the Louisiana Supreme Court has held that a litigant does not have the fundamental right to full recovery of his tortious injuries. Lallie Kemp, 428 at 1010, citing Bazley v. Tortorich, 397 So.2d 475 (La.1981). Second, the Supreme Court in Burmaster v. Gravity Drainage Dist. No. 2, 366 So.2d 1381 (La. 1978), reaffirmed the rule that the legislature may abolish causes of action before they vest. Finally, the Supreme Court explicitly rejected the quid pro quo argument that when a legislature abolishes a pre-existing right it must provide a substantial benefit in its place. Everett v. Goldman, 359 So.2d 1256 (La.1978).[16]
It has been said that a legislative power to create includes the power to destroy. If so, it also includes the power to limit. Thus, we hold that the limitation of liability in LSA-R.S. 40:1299.39 as applied to the state is not unconstitutional.
We are not unmindful of hardships that this decision may work upon the plaintiff, nor insensitive to the personal tragedy suffered by Ms. Sibley. Aware that the greater good hoped to be achieved by this statute is abstract and remote, and that the statute's application in this case seems harsh and immediate, we can only defer to the wisdom of the legislature for its passage of the law and note that it is our duty to interpret and apply that law as objectively and fairly as we can.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of these proceedings are assessed against the appellant.
AFFIRMED.

APPENDIX "A"
A. As used in this Part:
(1) "Person" means any individual acting in a professional capacity in providing health care services, by or on behalf of the state, and shall include but not be limited to a physician, psychologist, dentist, registered nurse, licensed practical nurse, pharmacist, optometrist, podiatrist, physical therapist, laboratory or x-ray technician, clinical social worker, or hospital administrator, acting within the course and scope of his employment, pursuant to a contract with the state, which contract specially names that health care provider, for professional services or to render other health care services, health care facility staff appointment, or assignment for or on behalf of the state, whether he receives compensation or not, without regard to where the services are performed, or performing voluntary professional services in a health care facility or institution for or on behalf of the state, or a resident, intern, or student, of any discipline listed herein who is assigned as a part of his prescribed training when acting within the course and scope of his assigned training or staff appointment, without regard to where the services are performed.
(2) "Physician" means a person with a license or permit to practice medicine in this state.
*769 (3) "Patient" means a natural person who receives or should have received health care from a person covered by this Part.
(4) "Tort" means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession licensed to practice in the state of Louisiana who is in good standing in a similar community or locale, and to use reasonable care and diligence, along with his best judgment, in the application of his skill; provided, however, that in the case of a health care provider practicing in a recognized field of specialty, the standard of care in rendering professional services or health care to a patient shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of that specialty in good standing, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
(5) "Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient.
(6) "Health care" means any act or treatment performed or furnished or which should have been performed or furnished by any person covered by this Part for, to, or on behalf of, a patient during the medical care, treatment or confinement of the patient.
B. Limitation of liability. Notwithstanding any other provisions of the law to the contrary, no judgment shall be rendered, and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interests and costs.
C. Coverage. Notwithstanding any other provision of the law to the contrary, the state shall pay any damages, interest, cost of investigation and defense, and any other costs in connection with any claim lodged against any health care provider ("person" as defined herein) for an alleged act of medical malpractice, resulting in the injury or death of a patient up to the limits set forth in this Part. The coverage provided herein shall apply only when the health care provider ("person" as defined herein) is acting within the course and scope of his employment, pursuant to a contract to render health care services, health care facility staff appointment, or assignment by or on behalf of the state, whether he receives compensation or not, without regard to where the services are performed; or while he is providing voluntary professional services in a health care facility or institution by or on behalf of the state, or a resident, intern or student, of any discipline listed in this Part who is assigned as a part of his prescribed training when acting within the course and scope of his assigned training or staff appointment, without regard to where the services are performed.
D. All malpractice claims against the state shall be submitted to and administered by the Division of Administration. In the administration of such claims, the Division of Administration shall cause a timely and thorough investigation of the circumstances surrounding each malpractice claim, assemble all data relevant thereto, and coordinate with legal counsel designated by the attorney general for the defense of such cases. With the approval of such legal counsel, the Division of Administration may compromise and settle any suit or claim up to the limits set forth in this Part. Provided further that in any suit or claim brought pursuant to this Part, the Division of Administration shall have the authority to pay all defense and investigative costs, and any other costs incurred in connection with the defense of these actions as said costs accrue.
E. The attorney general shall, with the concurrence of the Division of Administration, designate an attorney experienced in *770 the defense of medical malpractice claims to act as legal counsel for the Division of Administration in the defense of claims filed under this Part. The attorney general shall establish a fee schedule providing for payment of attorneys under contract on an hourly fee basis.
Except for the claims designated in Subsection F, any written compromise or settlement effected between the state and the claimant with the approval of legal counsel designated as provided above shall be binding upon the claimant and the state subject only to the approval of such compromise or settlement by the district court of the parish where the claimant is domiciled or the state capital is domiciled. The petition seeking court approval shall recite the essential facts alleged to constitute malpractice, the damages sustained, and the amount to be paid the claimant. The petition shall be executed by the claimant or his attorney and by legal counsel for the state. The court shall render and sign immediately a judgment, if it finds from an examination of the petition, attached exhibits, if any, and statements of the parties that the compromise or settlement is in the best interest of the state. At the first session of the legislature following the rendition of such judgment, the Division of Administration shall cause to be introduced a bill appropriating money to pay said judgment.
F. The Division of Administration, with the concurrence of appointed counsel, shall have the authority to compromise or settle, and pay any suit or claim brought pursuant to this Part up to $25,000.00 exclusive of interest and costs, without regard to the procedures outlined in Section E above.
G. Any person covered by this Part shall be considered as a named insured, and the coverage provided herein shall be primary.
NOTES
[1] The suit against Blue Cross was severed before trial. Issues relating to its liability are not present in this appeal.
[2] See LSA-R.S. 17:1517, added by Acts 1976, No. 470, § 1.
[3] His partner did administer a low dose of stellazine, a mild tranquilizer, while he was on vacation for a week, but he stopped that medication when he returned on August 4.
[4] Confederate, as mentioned above, is operated as an adjunct to LSUMC, and is primarily a teaching hospital. One of the requirements for becoming a member of the medical staff, to which the Board has delegated the functions of providing medical care to its patients, is to hold an LSU faculty appointment. See By-Laws of LSU Medical and Dental Staff, Confederate Memorial Medical Center, as adopted on March 17, 1977.
[5] LSA-R.S. 40:1299.39 as amended by Acts 1982, No. 851, § 1, is attached as Appendix "A." The only difference between the present statute and the statute as amended by Acts 1979, No. 450, § 1, applicable to the present claim, is the addition of clinical social workers and hospital administrators in par. A(1).
[6] Specifically, he argues that the medical staff was negligent in failing to supervise, review, or require consultation in the treatment of Ms. Sibley. He also argues that Confederate negligently structured the treatment of its patients around a "team" system approach in which the least experienced members of the team, the residents and medical students, are given primary responsibility for the day-to-day care and observation of the patient, while the senior and most experienced member, the faculty psychiatrist, has the least contact with the patient.
[7] See Comment, Recent Medical Malpractice LegislationA First Check-up, 50 Tul.L.Rev. 655 (1976). See also, LSA-R.S. 40:1299.41 et seq.
[8] LSA-R.S. 40:1299.39 A(1), as added by Acts 1976, No. 66, § 1.
[9] Acts 1978, No. 611, § 1 (emphasis added).
[10] Acts 1982, No. 851, § 1.
[11] See Garlington v. Kingsley, 289 So.2d 88 (La. 1974), wherein the Louisiana Supreme Court explicitly rejected the application of the doctrine of charitable immunity in Louisiana.
[12] See By-Laws of the LSU Medical and Dental Staff, Confederate Memorial Medical Center, n. 4, supra. The preamble to the by-laws acknowledges the board's, and therefore the state's, ultimate responsibility for the medical care of the patients treated at Confederate. However, since the individual members of the board are political appointees with no qualification or expertise in the field of medicine, it would be unreasonable and impractical to impose upon any one of them a duty of personally supervising or reviewing the medical treatment administered to the patients at Confederate. That duty falls squarely upon the medical staff, if anywhere.
[13] Consequently, we need not decide whether plaintiff's particular allegations of Confederate's negligence are meritorious or not.
[14] See Hargrave, "Statutory" and "Hortatory" Provisions of the Louisiana Constitution of 1974, 43 La.L.Rev. 647, 650 (1983), where Professor Hargrave says, "In short, the convention did not adopt broad sovereign immunity in all suits, but it did assume that sovereign immunity existed in some areas. Those areas were never defined." He describes this section as a compromise between complete abrogation and precise categorization.
[15] "Thus, whenever private citizens would be liable for certain conduct causing damage to person or property, the state and its agencies and political subdivisions also shall be liable for similar conduct." (Citations omitted.)
[16] In Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the U.S. Supreme Court cast similar doubt on the constitutional requirement of a quid pro quo: "Initially, it is not at all clear that the Due Process Clause in fact requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy." 98 S.Ct. at 2638. (Footnote omitted.)